# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs April 27, 2016

## STATE OF TENNESSEE v. DEVIN LAMAR JAMISON

**Appeal from the Criminal Court for Knox County**
**No. 101604     Bob McGee, Judge**

_____

**No. E2015-01894-CCA-R3-CD – Filed June 14, 2016**

_____

Aggrieved of his Knox County Criminal Court jury convictions of aggravated assault, possession with intent to sell more than one-half ounce of marijuana in a drug free school zone, evading arrest, resisting arrest, driving with a suspended license, failing to comply with the financial responsibility law, and violating the safety belt requirement and vehicle registration requirements, the defendant, Devin Lamar Jamison, appeals. In this appeal, the defendant claims that the trial court erred by refusing to admit a video recording into evidence, that the trial court erred by imposing a fine greater than $10 for the safety belt violation, and that the court erred by imposing consecutive sentences. Because the trial court erred by taxing the costs associated with the safety belt violation to the defendant, we remand that count to the trial court for the entry of a corrected judgment. We affirm the judgments of the trial court in all other respects.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed in Part; Reversed and Remanded in Part

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee (on appeal); and Russell Green, Knoxville, Tennessee (at trial), for the appellant, Devin Lamar Jamison.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Charme P. Allen, District Attorney General; and Jennifer Welch and Deborah Malone, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

While patrolling Arbor Place, a Knoxville's Community Development Corporation ("KCDC") property, on June 8, 2012, Knoxville Police Department ("KPD") Officer Clayton Madison exited his patrol car to investigate two trucks with out-of-state tags. After satisfying himself that the trucks belonged on the KCDC property, the officer walked back toward his patrol car. As he walked, he saw the defendant's car "approaching from the east on Hall of Fame" Drive and noticed that the defendant was not wearing a safety belt. When the defendant pulled into the apartment complex parking lot, Officer Madison, "raised [his] hand and motioned for [the defendant] to stop." The defendant stopped his car and opened the door as the officer approached.

When he got to the defendant's vehicle, Officer Madison encountered a strong odor of "raw marijuana" and a "very, very nervous" defendant. The defendant was unable to produce a driver's license or other form of identification. At that point, Officer Madison reached for his radio to call in the stop, and the defendant pushed past him and "ran east up the hill . . . through the complex." Officer Madison gave chase. When the defendant "slipped back down the hill," Officer Madison attempted to incapacitate the defendant with his taser, but both "prongs" of the taser failed to make contact. At that point, Officer Madison attempted to effectuate a "drive stun" to "complete the cycle so he's incapacitated." The two men struggled, and Officer Madison "was unable to drive stun" the defendant. The defendant ran "west through the complex" with Officer Madison in pursuit.

Officer Madison eventually caught up to the defendant, and as the two men struggled a second time, the defendant gained control of the officer's taser and stunned the officer. The defendant then ran "east through the apartment complex," and Officer Madison, despite having been stunned by the taser, followed.

Officer Madison gained and lost control of the defendant two more times before "other officers arrived and helped [Officer Madison] take him into custody." As a result of his struggle to apprehend the defendant, Officer Madison suffered injuries to his shoulder, hip, back, and knee. Cartilage in his shoulder that was torn during the melee had been surgically repaired by the time of trial, but the officer had yet to undergo surgery to repair torn cartilage in his hip because he could not afford to be out of work for the six to 12 months required for recovery. The cluster of injuries, he said, caused him considerable pain on a daily basis.

KPD Officer Brad Boruff responded to the scene after he heard Officer Madison's "yelling and screaming on the radio." When Officer Boruff arrived, he saw Officer Madison lying on the ground and other officers "fighting with the defendant in a

struggle trying to get him handcuffed." Officer Boruff walked to the defendant's car, and he "could smell a strong odor of marijuana coming from the car. Like really strong. The doors was shut, the windows were up, and you could still smell the odor." Upon searching the defendant's car, Officer Boruff discovered "a yellow Dollar General bag and it had a bunch of baggies, and then it had one baggie [that] was full of marijuana and a couple of scales." The marijuana had a field weight of 74 grams. Later testing by the Tennessee Bureau of Investigation confirmed that the material recovered from the defendant's car was 73.97 ounces of marijuana.

Officer Boruff also found two cellular telephones in the car. He did not find any drug paraphernalia of the type used to consume marijuana. The license tag affixed to the defendant's car was registered to a different vehicle.

KPD Officer Jason Kalmenak testified that he responded to Officer Madison's call for assistance. When he arrived, he saw Officer Madison and two other officers attempting to subdue the defendant, who was "actively fighting all three of them at the same time." After the defendant was handcuffed, Officer Kalmenak recovered from the defendant's person "a large wad of money," totaling $1,923, that was "wrapped around an EBT card" that bore the defendant's name. The officer described an EBT card as a card equivalent to food stamps. The defendant told Officer Kalmenak that he did not have a job at the time of his arrest.

Other proof established that the offenses occurred within 1,000 feet of Green Magnet School and the Green Magnet YMCA After School Care as well as within 1,000 feet of a public park.

The jury convicted the defendant in count one of aggravated assault, in count two of possession with intent to sell more than one-half ounce but less than 10 pounds of marijuana within 1,000 feet of a public school, in count three of possession with intent to deliver more than one-half ounce but less than 10 pounds of marijuana within 1,000 feet of a public school, in count four of possession with intent to sell more than one-half ounce but less than 10 pounds of marijuana within 1,000 feet of a public park, in count five of possession with intent to deliver more than one-half ounce but less than 10 pounds of marijuana within 1,000 feet of a public park, in count six of evading arrest, in count seven of resisting arrest, in count nine of driving with a suspended license, in count 10 of failure to comply with the financial responsibility law, in count 11 of a violation of the safety belt law, and in count 12 of a violation of the registration law. The trial court imposed a sentence of four years for the defendant's conviction of aggravated assault. The court merged counts three, four, and five into count two and imposed a two-year sentence for the resulting drug conviction, to be served consecutively to the four-year sentence imposed in count one. The court imposed a sentence of 11

months and 29 days for the conviction of evading arrest, sentences of six months for the convictions of resisting arrest and driving with a suspended license, and sentences of 30 days for failing to comply with financial responsibility and vehicle registration requirements. The court ordered the sentences imposed for the misdemeanor convictions to be served concurrently to the four-year sentence imposed in count one. The total effective sentence is, therefore, six years.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by excluding from evidence the video recording taken from the KCDC cruiser driven by Officer Madison, by assessing a fine and costs in excess of that allowed by the statute for his violating the safety belt law, and by imposing consecutive sentences. We consider each claim in turn.

## I. Video Recording

The defendant first asserts that the trial court erred by refusing to admit into evidence the video recording purportedly captured from the camera inside the KCDC cruiser that Officer Madison was driving at the time of the offenses. The State contends that the trial court correctly excluded the video recording because it was not relevant and was not properly authenticated prior to its being offered as evidence. The State also argues that any error in the exclusion of the recording was harmless because the jury viewed the recording in its entirety during the defendant's cross-examination of Officer Madison.

We note initially that the proffered video recording was not included in the record on appeal. The duty to prepare an adequate appellate record falls on the appellant, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), and, in the absence of an adequate record, this court must presume the trial court's ruling was correct, *see State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). Here, the defendant asks this court to reverse his conviction on grounds that the trial court improperly excluded a video recording without providing us the opportunity to view the recording. Making a proper assessment of the trial court's ruling in the context of the entire record without viewing the video recording is impossible. Consequently, we must presume that the ruling of the trial court is correct.

Moreover, although Officer Madison testified that the cruiser he drove on the day of the offenses was outfitted with a camera that recorded "one frame per second," the cruiser, and hence the camera, was pointed away from his interaction with the defendant. He had not reviewed the recording prior to the defendant's trial, and, upon viewing the video in court in front of the jury, Officer Madison could not say with

certainty that the recording was actually that captured by the camera in his cruiser on the day of the offenses. This testimony supports the trial court's decision to exclude the recording on grounds that the defendant had failed to establish that "this is the video that was actually taken on this day of that car, of that event." Finally, any error occasioned by the trial court's ruling would have been harmless given that the jury had seen the recording in its entirety, Officer Madison had been cross-examined regarding its contents, and the trial court did not instruct the jury to disregard either the recording or the testimony.

## II. *Fine and Costs for Safety Belt Violation*

The defendant next contends that the trial court erred by approving and imposing the $50 fine set by the jury for his violation of the safety belt law, arguing that Code section 55-9-603 caps the fine for a safety belt violation at $10. The State contends that Code section 55-9-603 contains no such cap, and therefore, the trial court had the authority to impose a fine of $50, the general limit for a Class C misdemeanor conviction.

At the time of the offense, Code section 55-9-603 provided that a violation of the safety belt requirement was "a Class C misdemeanor" and that "[a] person charged with a violation of this section may, in lieu of appearance in court, submit a fine of ten dollars ($10.00) for a first violation . . . to the clerk of the court." T.C.A. § 55-9-603(d)(1), (2) (2012). The statute also specified that "[n]o clerk's fee nor court costs . . . shall be imposed or assessed against anyone convicted of a violation of this section." *Id.* § 55-9-603(e). Code section 40-35-111 provides that the authorized sentence for a Class C misdemeanor is "not greater than thirty (30) days or a fine not to exceed fifty dollars ($50.00), or both, unless otherwise provided by statute." *Id.* § 40-35-111(e)(3).

The defendant argues that Code section 55-9-603's specification of a $10 fine for a first time violation of the safety belt requirement trumps the general provision of a $50 fine cap found in Code section 40-35-111. The State avers that Code section 55-9-603's specification of a $10 fine is applicable only to those offenders who wish to submit the fine "in lieu of an appearance in court." The State also argues that nothing in the statute prohibits the imposition of court costs to the defendant in this case.

We agree with the State that Code section 55-9-603 does not prohibit the $50 fine imposed in this case. The most basic principle of statutory construction is "'to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope.'" *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002) (quoting *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995)). "Legislative intent is determined 'from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle

construction that would extend or limit the statute's meaning.'" *Osborn v. Marr*, 127 S.W.3d 737, 740 (Tenn. 2004) (quoting *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000)). "When the statutory language is clear and unambiguous, we apply the plain language in its normal and accepted use." *Boarman v. Jaynes*, 109 S.W.3d 286, 291 (Tenn. 2003) (citing *State v. Nelson*, 23 S.W.3d 270, 271 (Tenn. 2000)). "It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources." *In re Estate of Davis*, 308 S.W.3d 832, 837 (Tenn. 2010) (citing *Parks v. Tenn. Mun. League Risk Mgmt. Pool*, 974 S.W.2d 677, 679 (Tenn. 1998)).

Typically, "'[a] special provision in a statute will control a general provision which would otherwise include that mentioned in the particular provision.'" *State ex rel. v. Safley*, 112 S.W.2d 831, 833 (1938) (quoting *Hayes v. Arrington*, 68 S.W. 44, 46 (Tenn. 1902)). Applying this maxim of statutory construction, the defendant argues, necessarily leads to a conclusion that the specific provision of a $10 fine in Code section 55-9-603(d)(2) governs in this case rather than the general Class C limit of $50. Code section 55-9-603(d)(2), however, provides that "[a] person charged with a violation of this section may, *in lieu of appearance in court*, submit a fine of ten dollars ($10.00) for a first violation." T.C.A. § 55-9-603(d)(2) (emphasis added). In our view, the legislature's use of the phrase "in lieu of appearance in court" indicates that the legislature intended the $10 fine to be applicable only to those offenders who choose to submit the fine instead of going to court. The lesser fine operates as a largess offered in exchange for the offender's submitting to the fine, using the lower fine as an incentive to encourage early payment. Accordingly, we do not believe that the trial court erred by approving and imposing the $50 fine set by the jury for the defendant's violation of the safety belt law.

We do not agree with the State, however, that the trial court was free to tax the costs associated with this conviction to the defendant. Code section 55-9-603(e) plainly states, without exception, that "[n]o clerk's fee nor court costs . . . shall be imposed or assessed against anyone convicted of a violation of this section." *Id.* § 55-9-603(e). Because the trial court erred by taxing the costs associated with this conviction, we remand that count to the trial court for the entry of a corrected judgment form.

### III. Consecutive Sentencing

In his final complaint, the defendant asserts that the trial court erred by imposing partially consecutive sentences in this case, arguing that the court erroneously determined him to be a professional criminal. The State contends that the trial court committed no error.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

With respect to consecutive sentencing, our supreme court has held that the standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013).

In this case, the trial court ordered the sentences imposed in counts one and two to be served consecutively based upon its finding that the defendant was a professional criminal. *See* T.C.A. § 40-35-115(b)(1) ("The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood."). The court observed that "the defendant was found in possession of a fairly large amount of marijuana" along with "baggies and scales," indicating that "the defendant was there to deal marijuana, to sell it." The court also observed that the defendant "was found to be in possession of nearly $2,000 in cash" despite having "no verifiable work history. He's 30 years old and has, apparently, never held down a regular job for any length of time." The court also noted that "just days after this event he was found, again, with marijuana and scales." Based upon this evidence, the court concluded, "He makes his living dealing marijuana."

In our view, the trial court did not abuse its discretion by imposing partially consecutive sentencing in this case. The defendant had $2,000 in cash and an EBT card issued in his name in his possession at the time of his arrest. The evidence adduced at trial established that the defendant possessed a large amount of high-quality marijuana along with all the accoutrements of a professional drug dealer. The presentence report supported the trial court's conclusion that the defendant, despite his age, had no verifiable

work history. These facts support the trial court's conclusion that the defendant was a professional criminal.

## *Conclusion*

Because the trial court erred by taxing the costs associated with the safety belt violation to the defendant, that count must be remanded to the trial court for the entry of a corrected judgment. The judgments of the trial court are affirmed in all other respects.

_____
JAMES CURWOOD WITT, JR., JUDGE